Theodore JUNIOR, Appellant,

v.

UNITED STATES, Appellee.

Nos. 88–CF–1577, 91–CO–1234.

District of Columbia Court of Appeals.

Argued Dec. 8, 1992.
Decided Nov. 29, 1993.

Richard Greenlee, Public Defender Service, with whom James Klein and Jo–Ann Wallace, Public Defender Service, Washington, DC, were on the brief, for appellant.

Margaret R. Batten, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., at the time the brief was filed, and John R. Fisher, Roy W. McLeese, III, Mark G. Gellar and Carolyn K. Kolben, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before ROGERS, Chief Judge, and FERREN, Associate Judge, and BELSON, Senior Judge.

ROGERS, Chief Judge:

In these consolidated appeals, appellant Theodore Junior appeals from his conviction of distribution of cocaine, D.C.Code § 33–541(a)(1) (Repl.1989), and the denial of his motion to vacate his conviction and sentence, pursuant to D.C.Code § 23–110. In both appeals he contends that he was denied the effective assistance of trial counsel, and that the trial judge erred in denying his motion without a hearing because, he maintains, trial counsel was ineffective in failing to file a motion to suppress identification testimony and physical evidence obtained in a warrantless entry in violation of the Fourth Amendment. The government responds that the trial judge properly denied appellant's motion to vacate the judgment as a successive motion, and, alternatively, that if there was error, a remand for an evidentiary hearing is required.

We hold that under the plain language of § 23–110(e), appellant's § 23–110 motion was not a successive motion. We further hold, however, that the trial judge erred in denying appellant's § 23–110 motion without a hearing on the ground that appellant lacked standing to raise Fourth Amendment claims because he was not an overnight guest at the home where he was arrested. Accordingly, we reverse the summary denial of the § 23–110 motion, and we remand the case for an evidentiary hearing on the motion; the direct appeal is stayed.

## I.

*Trial Evidence.* The government's evidence at trial showed that an undercover drug buy took place around 7:00 p.m. on April 7, 1987, at the Turleys' home at 3211 15th Place, S.E., between undercover police officer Renee Davis and two persons whom she identified at a show-up as appellant Theodore Junior and a Ms. Simpson. According to Officer Davis, Ms. Simpson had asked Officer Davis if she wished to purchase drugs. When Officer Davis said she did, Ms. Simpson led her to a house at 3211 15th Place, S.E., where appellant was standing in front of the open door. According to Officer Davis, appellant asked Ms. Simpson "Do you know her?," and Ms. Simpson assured appellant that Officer Davis was all right, that she had been there before. Upon learning the cost, Officer Davis gave fifty dollars in prerecorded money to Ms. Simpson.[1] Ms. Simpson then stepped inside the doorway with appellant and they "exchanged words." Ms. Simpson turned her back to Officer Davis and gave some or all of the money to appellant. Appellant then went upstairs and a few moments later returned with a small plastic bag containing a white powder, which he gave to Ms. Simpson who, in turn, gave it to Officer Davis.[2] Officer Davis left the area and broadcast a lookout for appellant; Officer Davis' partner saw Ms. Simpson as Officer Davis was returning to the car, and he broadcast a description.

Officer Buckley responded to the broadcast directing the police to 3211 15th Place, S.E., knocked on the front door, which was open about six inches, and announced, "police."[3] He looked up the stairway and saw a woman fitting Ms. Simpson's broadcast description; he went up the stairs and took her to Officer Buss, who was standing in the first floor living room. Officer Buckley then immediately went upstairs and saw a man fitting appellant's description, stopped him, advised him why he was being stopped, and walked him downstairs to Officer Buss. Later, out on the sidewalk, the police advised appellant and Ms. Simpson that they had been positively identified—by Officer Davis who had driven by—and both were searched by the police. The police found in appellant's left front pants pocket forty dollars in prerecorded funds (two ten dollar bills and one twenty) and an additional $280.

1. The officer turned over one twenty dollar bill, two ten dollar bills and two five dollar bills.

2. The substance in the bag field-tested positive for cocaine.

3. According to Officer Buss, the officers, who were in plain clothes, waited at least fifteen seconds before pushing open the door and entering the house.

Appellant's defense was that he had loaned money to Ms. Simpson, and that on the night in question she had given him sixty dollars to keep him from disposing of her ring, which appellant was holding as collateral for the loan. He denied ever giving Ms. Simpson drugs. He explained that he had been the legal guardian of Tommy Turley, the retarded son of the owner of the house, for three years, and that he came daily to the Turley home to feed the son. He was at the Turley house that day in response to Tommy's telephone call. According to appellant, he had become thirsty while preparing Tommy's food and, around 6:30 p.m., he had gone to get ice from a house three doors down. Upon returning he had seen Officer Davis looking into the Turley house where there were a lot of people.[4] Ms. Simpson, who lived across the street from the Turley house, called out to appellant that she wanted to see him, and he told her to come to the Turley house. Appellant told the elder Turley, who was sitting outside his house, that a policewoman was looking inside his house, and the elder Turley responded that nothing was happening inside. Appellant then went inside the Turley house. Five or ten minutes later Ms. Simpson came in, and she followed appellant upstairs. She left when appellant refused to take her personal check to hold her ring, but she returned within a minute or two and gave him sixty dollars (two twenties and two tens).[5] When appellant let Ms. Simpson out, he saw Officer Davis outside. According to appellant, Ms. Simpson returned to the Turley house a third time that

evening, and about ten minutes after she had returned, trying once again to get appellant to cash a check for her, the police entered the house. At that point, appellant was standing in the doorway of an upstairs bedroom. Appellant claimed that the front door had been closed.[6]

James Turley, Tommy's father, corroborated much of appellant's testimony.[7] Mr. Turley testified that on the day in question appellant had been at the house to fix food for Tommy. He explained that appellant, who did not live at the Turley house, came to visit the elder Turley as well as to take care of his son. He also explained that Ms. Simpson was in and out of the house that day, and that there were also other friends of the elder Turley in the house that day. Tommy's sister, Byrnie Turley, also provided corroborating testimony, confirming that appellant was Tommy's guardian and that Ms. Simpson had been in and out of the house that day.

Appellant's wife testified that appellant had given her a birthstone ring just before the summer of 1987, and that Ms. Simpson claimed it was hers. Appellant had told Ms. Simpson that she could have the ring if she paid for it.

*Presentence motion for a new trial.* The jury returned a guilty verdict on June 20, 1988. On July 9, 1988, appellant wrote the trial judge a letter complaining about his trial counsel's performance and asking the judge to take this into account at sentencing or to grant a new trial.[8] Before sentencing,

---

4. Appellant says he knew she was a police officer because he saw the print of a gun or radio on her person. He also claimed that he had seen her riding in a scout car a few days earlier.

5. Appellant explained he also had a roll of money which he had received earlier in the day from his wife.

6. Appellant also admitted to a prior conviction of possession of cocaine in March 1988.

7. Appellant and the elder Turley had served together in the armed services in Korea. Mr. Turley was 58 years old, retired, and he received disability benefits from the Veterans Administration as a result of a hand injury suffered during the war.

8. Appellant stated in his letter that his trial attorney had suffered a stroke and had not fully

recovered, as was demonstrated by his ineffective cross-examination and the fact that he failed to remember things that appellant had told him would assist in the defense. He faulted his attorney for failing to bring out that the co-defendant Ms. Simpson owed him $150, not sixty dollars, which appellant claimed was critical since the officers had found only forty dollars in pre-recorded funds on him and he had testified that Ms. Simpson had given him sixty dollars; the larger debt evidence provided support for appellant's explanation of what had happened the night he was arrested. Significantly, he also faulted counsel for failing to disclose adequately the non-drug-related reasons for appellant's presence at the Turley house. He also noted that the officers who claimed to be the arresting officers were not the arresting officers, that $300 was missing from the property statement of the funds taken from him by the police, and that a white

newly appointed counsel for appellant filed, on December 1, 1988, a motion for a new trial. In the motion, appellant contended that his trial counsel had been ineffective because he had failed to investigate, locate, interview, prepare and subpoena either government or defense alibi witnesses, and because his performance at trial, particularly his opening statement, cross-examination and closing statement, had been deficient.

At the hearing on the presentence motion, however, trial counsel testified, on cross-examination, that he had not filed a motion to suppress the money found on appellant because "I didn't think the motion to suppress would lie and I don't file motions to suppress as a discovery method." When asked why he did not think the motion would "lie," trial counsel responded, "I didn't think it would lie, that's my professional opinion." Pressed for a further explanation, trial counsel stated, "Given the scenario that had been laid out to me by the prosecutor and the police, by the police files, [and based on what his client had told him had happened], it appeared that the search was legal." Although admitting that the defense at trial was misidentification, trial counsel nevertheless testified that he did not believe that there was a basis for thinking that a motion to suppress would have been successful in view of his understanding of the conduct of the police.

During argument on the motion, appellant's new counsel argued that trial counsel was deficient for failing to file a motion to suppress the identification testimony and the forty dollars in pre-recorded funds found on appellant at the time of his arrest. New counsel referred to the fact that appellant had given trial counsel information which showed that there was a basis for the motion, and that trial counsel had failed to give any legal reasons for not filing it. When the trial

judge inquired about the theory underlying a suppression motion, new counsel responded only that he was not claiming that the motion would have been granted but that it should have been filed. The trial judge observed that if an attorney thinks a motion has little chance of being granted, "if it bordered on the frivolous, maybe then he doesn't have an obligation to file it." Observing that trial counsel was confronted with a denial by his client of involvement in an alleged drug sale to an undercover officer, the trial judge suggested that in order to pursue a suppression motion, trial counsel would have to risk having appellant's suppression testimony used as impeachment against him at trial.[9] When new counsel protested that he thought trial counsel had an obligation to file a suppression motion when his client denied involvement and saw the woman in the house where appellant was arrested, the judge responded that trial counsel had to make some tactical decisions.

Thereafter, the trial judge denied the presentence motion for a new trial without specifically mentioning trial counsel's failure to file a motion to suppress.[10] The judge sentenced appellant on December 8, 1988, to the mandatory minimum of twenty months to five years.

Appellant filed a timely notice of appeal on the basis of claims of ineffective assistance of counsel and the insufficiency of the evidence. On March 27, 1991, appellant moved to stay his appeal from his conviction while he filed a motion, pursuant to D.C.Code § 23–110, to vacate the judgment of conviction and for a new trial on the grounds of ineffective assistance of counsel. On April 24, 1991, appellant filed his § 23–110 motion in the trial court, and on May 24, 1991, this court granted the motion to stay the appeal.

officer had stated to the Turleys that he did not want to testify because of the lack of evidence and because he thought appellant was not guilty.

9. The trial judge referred to *In re F.G.*, 534 A.2d 297, 298 (D.C.1987). *But see In re F.G.*, 576 A.2d 724, 727–28 & n. 4 (D.C.1990) (en banc).

10. The trial judge found, after reviewing all of appellant's allegations, "a very minimal showing of deficient performance and no showing of prej-

udice." While trial counsel was deficient for using an investigator who was scared or too timid to do his job, the judge credited trial counsel's testimony that appellant was giving him a bogus story about winning money at a poker game. The judge concluded that the jury had heard from all the witnesses who could help appellant and that trial counsel had presented appellant's story to the jury.

*Post-conviction motion to vacate the judgment.* In his post-conviction motion under § 23–110, appellant focused on trial counsel's failure to file a motion to suppress.[11] The motion summarized the trial testimony relating to the suppression issue and argued that prior counsel and the trial judge had "overlooked" the fact that "appellant had a meritorious motion to suppress the show-up identification and the funds recovered from his pocket." Such a motion was based on the legal theory that "the warrantless entry into 3211 15th Place, and the attendant seizure of appellant, violated the Fourth Amendment's prohibition against unreasonable seizures"; hence, the subsequent show-up and seizure of the money were "fruits of the impermissible entry." The § 23–110 motion also maintained that the transcript of the 1988 hearing made clear that trial counsel did not have a tactical reason for not filing a motion to suppress but simply thought that it would not be successful. Further, appellant's new counsel had not alerted the trial judge in 1988 to the appropriate legal theory on which the motion to suppress would have been based, leaving the judge to speculate. Relying on *Kimmelman v. Morrison,* 477 U.S. 365, 375, 106 S.Ct. 2574, 2582–83, 91 L.Ed.2d 305 (1986), appellant argued in his § 23–110 motion that if the suppression motion had been filed, the outcome of the trial would have been different.

In the motion, appellant argued, first, that under *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), decided after the trial judge had denied the presentence motion in 1988, appellant had a legitimate expectation of privacy in the Turley home. In an affidavit attached to the motion, appellant supplemented the trial testimony about his close ties to the Turley residence and the capacity in which he went to that residence, stating that he sometimes spent the night at the Turley home and left his medication and some clothes there. Second, appellant argued that under *Dorman v. United States,* 140 U.S.App.D.C. 313, 317, 435 F.2d 385, 389 (1970), it was clear that there were no exigent circumstances justifying the warrantless police entry. Third, appellant maintained that the description by the undercover officer was not sufficiently detailed to provide probable cause to arrest appellant, and because the observation after the illegal entry caused the police to remove appellant and subject him to a show-up identification, the identification should have been suppressed as the fruit of an illegal arrest, citing *Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). For the same reasons, citing *United States v. Crews,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), appellant argued that the money and identification photos should also have been suppressed as fruits of the illegal entry. Fourth, the § 23–110 motion concluded, upon a review of the remaining evidence, that it was "highly probable" that an acquittal would have occurred had the fruits of the illegal entry been suppressed.[12]

The government's opposition did not address the merits of appellant's Fourth Amendment argument. Instead, the government maintained that the trial judge should not entertain a successive petition asserting the same claim. Having determined, in ruling on the 1988 presentence motion for a new trial, that trial counsel was competent based

---

11. The motion conceded at the outset that the 1988 new trial motion filed by new counsel "did not allege that original trial counsel was ineffective in failing to file a motion to suppress the show-up identification and the money," and it "did not assert that trial counsel was ineffective for failing to object to the testimony about and the admission of the $280 which were described at trial as 'suspected proceeds of crime.'" The § 23–110 motion also acknowledged that although the trial judge had heard testimony and argument about a suppression motion, and "although new counsel who claims that original [trial] counsel was ineffective in failing to file a motion to suppress must be prepared to put on evidence at a hearing on ineffectiveness to demonstrate that the motion would have been grant-ed[,] [s]ee *Hockman v. United States,* 517 A.2d 44, 50 (D.C.1986); *Asbell v. United States,* 436 A.2d 804, 815 (D.C.1981)[,] [new] [c]ounsel did not present to ]the trial judge] the legal basis as to why a motion to suppress would have prevailed."

12. Appellant pointed out that had the motion to suppress been granted, the government would have been left with an undercover officer testifying about a drug sale that was over a year old and no evidence that the police had recovered any pre-recorded money from appellant. Appellant also sought a hearing on the validity of the show-up on due process grounds, citing *In re F.G., supra* note 9, 576 A.2d at 725.

on a reasonable tactical decision not to file a suppression motion, the government argued that the trial judge was not obligated to address the prejudice prong of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and that appellant's claim of prejudice could be raised as part of the direct appeal.

The trial judge denied the § 23–110 motion without a hearing. In his order, the trial judge stated that "the short answer" to appellant's ineffectiveness claim based on trial counsel's failure to file a suppression motion was that the judge had found, after conducting an evidentiary hearing on the presentence motion, no representational deficiency as a result of trial counsel's "tactical decision" not to file such a motion. The judge further stated, however, that:

> Although one such finding is enough, the Court notes that present counsel's suppression argument is predicated entirely on the assumption that the later decided case of *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), would mandate that such a motion be granted. This Court disagrees with that assumption. Unlike the respondent in *Olson,* the defendant herein was clearly not an overnight guest in the Turley household at the time of the warrantless entry into the premises. Hence, he had no legitimate expectation of privacy which would have given him standing to challenge said entry.[13]

## II.

On appeal, appellant contends that the trial judge erred in denying his § 23–110 mo-

tion because it showed that a Fourth Amendment motion would have been successful and that the result of the trial could have been different had the identification evidence and the money been suppressed. Noting that the government's opposition to the post-trial motion simply argued that the judge was not required to re-examine his earlier ruling on trial counsel's performance, appellant maintains that the trial judge addressed the merits of the § 23–110 claim but erred in ruling, without a hearing, that appellant lacked standing, citing *Gibson v. United States,* 388 A.2d 1214, 1216 (D.C.1978) (directing "an evidentiary hearing *unless* the allegations of the motion itself are vague and conclusory, are wholly incredible, or, even if true, would merit no relief"). Appellant argues, further, that the trial judge properly decided to address the § 23–110 motion in light of *Shepard v. United States,* 533 A.2d 1278, 1280 (D.C. 1987), requiring the filing of such a motion during the pendency of a direct appeal when it appears trial counsel was ineffective. The government responds that appellant's § 23–110 motion was "a successive attempt to relitigate an issue previously ruled upon by the court," that the trial judge agreed, stating " 'one such finding is enough....,' " [14] that the trial judge was correct as a matter of law in denying the second motion for a new trial, and that his ruling was a proper exercise of discretion.

## A.

■ The government maintains that under § 23–110(e) the trial judge did not have to

---

13. The judge observed, however, that appellant relied on an affidavit claiming facts not addressed at trial or the presentencing hearing. Regarding appellant's claim of trial counsel deficiency based on the failure to object to introduction of $280 as "suspected proceeds of crime," the judge adopted the government's argument that "this is a matter that could have been raised in the 1988 collateral attack on the conviction and hence, it is an 'abuse of the writ' ... to raise it now for the first time in this second collateral attack." Citing *McCleskey v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), the judge found that appellant had not attempted to show cause for not previously raising the issue and that, were the court required to reach the prejudice prong, it would find none.

14. The government takes issue with appellant's view that the trial judge reached the merits of the § 23–110 motion. In its view, the judge "simply commented on the inapplicability of one of the cases relied on by appellant to establish a legitimate expectation of privacy in the Turley home.... But the court never returned to the merits of appellant's claim of ineffective assistance. The court made no findings of facts ... [and did not] reach[] any legal conclusions on the basis of the law applicable at the time a motion to suppress would have been litigated." However, it is hardly uncommon for a trial judge to make alternative rulings.

entertain a second or successive motion for similar relief by appellant.[15] D.C.Code § 23–110(e) provides that the trial court "shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner." Under the plain language of the statute appellant's § 23–110 motion is not a successive motion.

The trial judge treated appellant's letter complaining about his trial counsel as a motion for a new trial. *See* Super.Ct.Crim.R. 33. Although the letter was not filed within seven days after the verdict, and hence, the time for filing such a motion had passed, *see id.*, and the trial judge was technically without authority and the hearing held a nullity, this did not mean that the motion was properly to be considered as filed under § 23–110. Only prisoners "in custody under sentence of the Superior Court" may make such motions, and appellant had not yet been sentenced. *See Newton v. United States*, 613 A.2d 332, 332 n. 1 (D.C.1992); *(Vincent) Johnson v. United States*, 585 A.2d 766, 769 n. 3 (D.C. 1991).

The fact that appellant raised an ineffective assistance of counsel claim in his presentence motions did not make them motions filed under § 23–110. Such claims may be raised under both Rule 33 and § 23–110. *See Godfrey v. United States*, 454 A.2d 293, 302 (D.C.1982). Our caselaw marks the distinction between Rule 33 motions and § 23–110 motions on the basis of whether the defendant has been sentenced. *Compare Newton, supra*, 613 A.2d at 332 n. 1 (*pro se* letter alleging ineffective assistance of counsel, written after verdict but before sentencing, properly treated as filed pursuant to Rule 33 rather than § 23–110) *and (Vincent) Johnson, supra*, 585 A.2d at 769 n. 3 (same) *with (Jimmy) Johnson v. United States*, 385 A.2d 742, 743 (D.C.1978) (post-judgment motion for new trial properly treated as § 23–110 motion). Since appellant's letter, treated by the trial judge as a motion, and newly-appointed counsel's motion for a new trial were filed before appellant was sentenced, there is no basis under the statute or court rules for characterizing them as post-sentence § 23–110 claims.

In other words, for the provisions of § 23–110(e) to be invoked, the first motion must be a post-conviction motion under § 23–110 before the later post-conviction motion under § 23–110 can be deemed a "second or successive motion." Appellant's § 23–110 motion to vacate the judgment of conviction was his first post-conviction attack and his first motion under § 23–110. While the relief he sought, based on an ineffective assistance of counsel claim, was similar, motions under Rule 33 and § 23–110 are not motions for similar relief under § 23–110(e). The policy reasons in support of the finality of judgments and the avoidance of successive collateral motions are not implicated to the extent that appellant's resentencing motion could not have attacked the judgment of conviction, which was nonexistent at the time. This is clear from two decisions, relied on by the government, involving successive petitions filed after affirmance of the direct appeal, namely *Moore v. United States*, 608 A.2d 144, 146 (D.C.1992) (issues raised in § 23–110 motion regarding unconstitutional sentence "identical to those resolved" in direct appeal, and defendant failed to show cause for not presenting "new" evidence in connection with his direct appeal or to demonstrate prejudice), and *Hurt v. St. Elizabeths Hospital*, 366 A.2d 780, 781 (D.C.1976) (to extent allegations in § 23–110 motion "merely repeat the previously rejected contentions" in an earlier habeas petition, "they need not have been considered by the trial court judge").

In addition, appellant filed his § 23–110 motion, and obtained a stay of his direct appeal, in order to pursue his ineffective assistance of counsel claim in the trial court.[16] The government agreed, in the trial court, that appellant could pursue his ineffec-

---

**15.** The government also maintains that the second motion was an abuse of writ. Appellant effectively refutes this contention in his reply brief by pointing out that the government cannot claim both that a motion is successive and an abuse of writ. A successive motion is identical to the first motion; an abuse of writ alleges a new ground. *See McCleskey v. Zant, supra* note 13, 499 U.S. at 487, note 13, 111 S.Ct. at 1466.

**16.** A similar procedure exists in the federal courts. *See United States v. Tindle*, 173 U.S.App. D.C. 77, 81, 522 F.2d 689, 693 (1975).

tive assistance of counsel claim on appeal. It now argues in its brief on appeal, however, that, in order to determine the merits of appellant's § 23–110 motion, a remand would be required if the privacy interest issue is to be addressed. In contrast with the government's somewhat cumbersome procedural position, appellant proceeded in accordance with *Shepard, supra,* 533 A.2d at 1280, so as to avoid both the possibility of piecemeal appeals and the need for a remand after both parties had filed appellate briefs and the court had addressed the trial judge's ruling on appellant's § 23–110 motion. The procedure followed by appellant would assure that his Sixth Amendment claims are fully presented without implicating the government's finality concerns as reflected in its cited authority, which is inapposite here.

Accordingly, we hold that under the plain language of § 23–110(e), appellant's § 23–110 motion is not a second or successive motion, and hence the trial judge could not properly deny appellant's motion on that ground.

### B.

The merits of appellant's contention that the trial judge erred in denying his § 23–110 motion rest on his claim that trial counsel was ineffective for failing to file a suppression motion based on the warrantless entry into the Turley home. Because the trial judge precluded any inquiry by ruling that appellant lacked standing, appellant also contends that the judge erred because appellant had a reasonable expectation of privacy in the Turley home in view of his close ties with the Turley household.[17] Contrary to the trial judge's ruling that because appellant was not an overnight guest at the Turley home he did not have standing to raise his Fourth Amendment claim, *Minnesota v. Olson, supra,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 does not hold that *only* an overnight guest has a legitimate expectation of privacy in another's home.

"The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home.... Absent exigent circumstances, that threshold [of the entrance to the house] may not reasonably be crossed without a warrant." *Payton v. New York,* 445 U.S. 573, 589–90, 100 S.Ct. 1371, 1381–82, 63 L.Ed.2d 639 (1980) (routine felony arrest). Because appellant did not live at the Turley home, he had to establish that he had "a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). In *Minnesota v. Olson, supra,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 the Court applied the standard that "[a] subjective expectation of privacy is legitimate if it is 'one that society is prepared to recognize as reasonable,'" 495 U.S. at 95–96, 110 S.Ct. at 1687–88 (quoting *Rakas v. Illinois, supra,* 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430 n. 12 (quoting *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (1967) (Harlan J., concurring))), in holding that a houseguest has a legitimate expectation of privacy in his host's home.[18] *Minne-*

---

**17.** The government's response, that appellant did nothing during the first hearing to establish these ties, is mistaken. Although appellant did not testify about spending the night and leaving his medication and clothes at the Turley home, which he mentions in the affidavit attached to his § 23–110 motion, appellant's trial testimony, which was corroborated by other members of the Turley family, indicated that he was the legal guardian of the Turley son, came daily to the Turley home to care for their son, and was at the Turley home for that purpose on the day that he was arrested.

**18.** Prior to 1990, when *Minnesota v. Olson* was decided, this court had held in *United States v. Booth,* 455 A.2d 1351, 1353 (D.C.App.1983) (cit-

ing *Rakas v. Illinois, supra,* 439 U.S. at 143, 99 S.Ct. at 430 and *Katz, supra,* 389 U.S. at 360, 88 S.Ct. at 516) that the defendants had a legitimate expectation of privacy in the front hallway of their rooming house sufficient to give them standing to challenge the police officer's warrantless entry. This court had also held, in *Martin v. United States,* 567 A.2d 896, 903 (D.C. 1989), *appeal after remand,* 605 A.2d 934, *cert. denied,* ⸺ U.S. ⸺, 113 S.Ct. 632, 121 L.Ed.2d 563 (D.C.1992), that the defendant as a part-time resident had standing to object to the entry of police into his grandparents' home (citing *Rakas v. Illinois, supra,* 439 U.S. at 142 n. 11, 99 S.Ct. at 430 n. 11 and *United States v. Robinson,* 225 U.S.App.D.C. 282, 698 F.2d 448 (1983)). In *Booth, supra,* 455 A.2d at 1353, and *Robinson,*

*sota v. Olson, supra,* 495 U.S. at 98, 110 S.Ct. at 1688–89. Consequently, the empirical question is whether appellant's alleged expectation of privacy in the Turley home is "rooted in 'understandings that are recognized and permitted by society.'" *Id.* at 100, 110 S.Ct. at 1690 (quoting *Rakas v. Illinois, supra,* 439 U.S. at 144 n. 12, 99 S.Ct. at 431 n. 12).

Appellant testified at trial that for three years he had daily use of the Turley home in connection with being the legal guardian of Tommy Turley, the retarded son of James Turley, who owned the house at 3211 15th Place, S.E.[19] As guardian, appellant received a monthly check and his responsibilities included making sure that Tommy had food, clothing and shelter. Appellant came to the house every day in order to feed Tommy. Indeed, Tommy had previously lived with appellant and his wife in their home. On the day in question, appellant testified, Tommy had called him to request that he come to the Turley home to prepare food for him. Even without the additional facts set forth in appellant's affidavit (relating to keeping clothes and medicine in the Turley home and occasionally spending the night), appellant presented evidence of connections to the Turley house that are in excess of those found sufficient by courts in other jurisdictions for standing to raise Fourth Amendment claims. *See, e.g., People v. Moreno,* 2 Cal.App. 4th 577, 3 Cal.Rptr.2d 66 (5 Dist.1992) (babysitter, who was brother of owner, had standing); *State v. Anonymous (1984–1),* 40 Conn.Supp. 20, 480 A.2d 600 (1984) (babysitter had standing in home). Appellant's relationship to the Turley family and its home, and his presence on the eve-

ning in question, were clearly greater than those of the defendants in *Prophet v. United States,* 602 A.2d 1087, 1091 (D.C.1992) (mere guest does not have standing), and *Lewis v. United States,* 594 A.2d 542, 545–46 (D.C. 1991) (party guest who fell asleep on bed does not have privacy interest). Rather, his relationship to the Turley home was closer to that in *Rose v. United States,* 629 A.2d 526, (D.C.1993), where a nephew who regularly visited his aunt and uncle once or twice a week and had a key to their apartment was held to have a reasonable expectation of privacy in their apartment. The facts contained in the motion affidavit lend added weight to appellant's claim that he had an expectation of privacy in the Turley home. *See State v. Corpier,* 793 S.W.2d 430, 437 (Mo.Ct.App. 1990) (standing where defendant spent three to four nights a week in the apartment, eating at least one meal a day there and keeping clothes there); *see also Martin, supra* note 18, 567 A.2d at 896 (part-time resident in grandparents' home had standing). Other factors are not developed in the record, and in view of the credibility determinations at issue, the trial court should initially decide whether appellant had a legitimate expectation of privacy in the Turley home, since the trial judge's ruling on standing was not harmless error.[20]

The police made a warrantless entry into the Turley home without probable cause to arrest appellant, and "the evidentiary basis for detaining" appellant arose from finding him in the home. *Martin II, supra* note 18, 605 A.2d at 937 n. 6 (discussing *Bryant v. United States,* 599 A.2d 1107, 1111 (D.C. 1991), and *New York v. Harris,* 495 U.S. 14,

---

*supra,* 225 U.S.App.D.C. at 288, 698 F.2d at 454, the courts identified factors to be considered in making the privacy determination.

**19.** Appellant testified that he was the legal guardian of Tommy Turley, who was twenty or twenty-one years old, and had known James Turley, Tommy's father, for thirty years. James Turley and a sister, Byrnie Turley, corroborated appellant's testimony about his relationship to the Turley family and home and his presence on the day in question.

**20.** The government points to several inconsistencies: (1) appellant's affidavit attached to his 1991 motion states that the police entered the Turley

home around 5:30 p.m., but at trial he testified that he did not arrive until around 6 p.m. and first saw Ms. Simpson outside around 6:30 p.m.; (2) the pretrial services report indicates that appellant stated he did not receive medication for his diabetes. The first issue is irrelevant to standing, and the second appears peripheral in view of other elements of appellant's relationship to the Turley home. The government's argument, that to the extent appellant relies on defense trial testimony, it was discredited by the jury's verdict, misstates the posture of the case for purposes of consideration of whether or not the outcome of the trial would have probably been different if the identifications and the prerecorded money had been suppressed.

20, 110 S.Ct. 1640, 1644, 109 L.Ed.2d 13 (1990)).[21] *See also Payton v. New York, supra,* 445 U.S. at 585, 602–03, 100 S.Ct. at 1379, 1388–89 (citation omitted). As appellant's motion points out, the undercover officer's description was insufficiently specific to constitute probable cause to arrest appellant.[22] It was only as a result of entering the Turley home and taking appellant outside for a show-up that he was identified by the undercover officer as one of the two drug distributors. In other words, the evidence to arrest appellant was obtained as a result of a warrantless entry without probable cause into a home and was, therefore, suppressible under well settled pre–*Harris* principles. *See New York v. Harris, supra,* 495 U.S. at 18–19, 110 S.Ct. at 1643–44 (citing *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); and *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), "for the familiar proposition that the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality"). Appellant is also entitled, however, to the benefit of *Bryant, supra,* 599 A.2d at 1112. *See supra* note 21.

Thus, in *Bryant, supra,* 599 A.2d at 1112,[23] where the police had been told that the suspect was a black male wearing a brown suede-like jacket and gray khaki pants and had sold narcotics in the vicinity of a certain address, the court held that "[u]nless and until the officers found someone matching that description *in proximity to that address,* the description conveyed ... was too general to justify seizing anyone under *Terry.*" Here, as in *Bryant,* finding the person in proximity to the address is central to identifying appellant as the drug seller, although there was evidence that a number of other people were inside the Turley home at the time appellant was arrested. The *Bryant* court pointed out that where an identification is the result of an illegal arrest, the fact that the suspect could have been viewed as the result of a legal process does not change the fact that he or she was viewed as the result of an illegal process. Thus, the court concluded that a suppression would serve the exclusionary purpose of "denying the government 'the indirect fruits of an illegal search ...'" *Bryant, supra,* 599 A.2d at 1112 (citations omitted). Since the arrest of appellant would have been unconstitutional if the appellant had a legitimate privacy interest in the Turley home, the identification arising out of it would be an "indirect fruit" and would have to be suppressed.

Accordingly, we remand the case to the trial court for a hearing on appellant's § 23–110 motion in order to determine whether appellant had a protected privacy interest in the Turley home at the time of his arrest. *See Gaston v. United States,* 535 A.2d 893, 900 (D.C.1988) (presumption a hearing should be held). If the trial court finds that appellant had such a privacy interest, then the trial court must determine whether the outcome of the trial would probably have been different had trial counsel

---

21. Although *New York v. Harris* was decided after the trial in the instant case, it is still applicable. *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) ("a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past").

22. The undercover officer described the male drug seller as a "black male, older gentleman. He has gray and black hair. I said that it was gray and black hair on his face. He also had a blue and rust striped sweater, blue jeans and brown boots." The officer reported that he was inside of a house at 3211 15th Place.

23. The government contends that this case is inapplicable because it was decided after the first hearing. This court has, however, relied on cases decided after appellant's trial if the "general principles are of long-standing vintage." *Wright v. United States,* 608 A.2d 763, 767 (D.C. 1992). Here, the general principle is that a fruit of an unlawful search cannot be used as justification to hold a suspect for a subsequent show-up. *Bryant, supra,* 599 A.2d at 1112. These principles are of long-standing importance in this jurisdiction. *See Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963); *Crews v. United States,* 389 A.2d 277, 288–89 (D.C.1978) (en banc), *rev'd on other grounds,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980).

filed a motion to suppress the show-up identification and its fruits. Appellant maintains that because the undercover officer's identification of appellant at trial would have been more than a year old, it is likely, in view of the weakness of the government's evidence, that the verdict would have been different. *See supra* note 12. This is a determination to be made in the first instance by the trial court. *See Rice v. United States,* 580 A.2d 119, 123 (D.C.1990). Pending the outcome of the remand, the direct appeal is held in abeyance.

FERREN, Associate Judge, concurring:

I concur in the opinion for the court. I write separately to explain why I join in Part II.A.

Less than a month after his trial and before he was sentenced, appellant wrote a letter to the trial judge complaining of ineffective assistance of counsel at his trial. The trial judge chose to treat this letter as a motion for a new trial, appointed counsel to represent appellant, and held a hearing on appellant's allegations. Concluding that trial counsel's representation was not constitutionally deficient, the trial judge denied the motion and proceeded to sentence appellant. Thereafter, appellant filed both a direct appeal in this court and a motion under D.C.Code § 23–110 (1989) in the trial court collaterally attacking his conviction for ineffective assistance of counsel.

The government argues that the trial court properly dismissed appellant's § 23–110 motion as "successive." According to the government, we should view appellant's initial motion for a new trial as if it were a § 23–110 motion because it constituted a collateral attack on the jury's verdict. Consequently, the government concludes, we should treat appellant's first post-sentence § 23–110 motion as if it were already a second, "successive" § 23–110 motion for relief. I cannot agree with that analysis.

The trial court received appellant's *pro se* letter complaining about his trial counsel after the applicable deadline for new trial motions had passed.[1] But that fact does not, by itself, transform the letter into a § 23–110 motion; only prisoners "in custody under sentence of the Superior Court" may make such motions, D.C.Code § 23–110(a), and the trial court had not yet sentenced appellant. *See Newton v. United States,* 613 A.2d 332, 332 n. 1 (D.C.1992); *(Vincent) Johnson v. United States,* 585 A.2d 766, 769 n. 3 (D.C. 1991). Technically, then, the trial court was acting without discernible authority when it held a hearing on the claims in appellant's letter, since the letter came too late to be a proper new trial motion and too early to be a proper § 23–110 motion. Under the plain language of the statute, therefore, the post-conviction § 23–110 motion cannot be deemed a "second or successive motion for similar relief" under § 23–110; it either followed a hearing on a motion that should be deemed a nullity or followed a hearing on a properly entertained motion that could not have been brought under § 23–110.

Assuming that the trial court could properly exercise its discretion to consider appellant's letter/motion on the merits, I see no reason to call this first motion anything but what the trial court called it: a motion for a new trial. Certainly appellant's ineffective assistance claim, as such, did not automatically make his letter a § 23–110 motion, since we have said that a criminal defendant may bring an ineffectiveness claim in the trial court through a motion for new trial under Super.Ct.Crim.R. 33, as well as through a motion to vacate sentence under D.C.Code § 23–110. *See Godfrey v. United States,* 454 A.2d 293, 302 (D.C.1982). Furthermore, our caselaw clearly indicates that, for purposes of distinguishing between a Rule 33 motion and a § 23–110 motion, the true line of demarcation is whether or not appellant has been sentenced and the conviction has become final.[2] *Compare Newton,* 613 A.2d at 332 n. 1

1. "A motion for a new trial based on any other grounds [than newly discovered evidence] shall be made within 7 days after verdict or finding of guilty or within such further time as the Court may fix during the 7–day period." Super.Ct.Crim.R. 33.

2. The exception to this rule is a motion based upon newly discovered evidence, which may be filed up to two years after final judgment. *See* Super.Ct.Crim.R. 33.

(*pro se* letter alleging ineffective assistance of counsel, written after trial but *before sentencing,* properly treated as filed pursuant to Super.Ct.Crim.R. 33, rather than D.C.Code § 23–110) *and (Vincent) Johnson,* 585 A.2d at 769 n. 3 (same) *with (Jimmy) Johnson v. United States,* 385 A.2d 742, 743 (D.C.1978) (*post-judgment* motion for new trial properly considered as § 23–110 motion). Since appellant's first motion—and the trial court's resolution of it—preceded sentencing, there simply is no basis under the statute or court rules for characterizing it as a post-sentence § 23–110 claim.

The government argues, nonetheless, that appellant's pre-sentence motion should be treated as a collateral attack, effectively brought under § 23–110, because it questions the jury's verdict. The government's logic, however, implicates not just the anomalous first motion made by appellant in this case but any motion for a new trial. If we accept this argument, any Rule 33 motion might be deemed a form of collateral attack that bars consideration of even a first § 23–110 motion filed thereafter. This court has never taken such a position.[3] Nor have I been able to locate any case in this jurisdiction or elsewhere suggesting that a first motion for habeas corpus relief should ever be treated, and thus denied, as "successive" to a pre-sentence motion for a new trial.

Were we to espouse this view, we would be expanding the limitation on "successive" § 23–110 motions well beyond its statutorily defined scope, arguably usurping the role of the legislature and covertly applying principles of res judicata that we have always rejected in this context. *See Kirk v. United States,* 510 A.2d 499, 504 (D.C.1986); *Pettaway v. United States,* 390 A.2d 981, 986 (D.C.1978).

D.C.Code § 23–110(e) provides in full: "The court shall not be required to entertain

a second or successive motion for similar relief on behalf of the same prisoner." This language means that the *first* motion that precludes a "second or successive motion" must itself be a post-conviction motion under § 23–110. There is no room to read § 23–110(e) to permit the first motion to be a pre-sentence motion; the statutory concern is "second or successive" collateral attacks on final judgments of conviction. It follows that, even though a post-conviction § 23–110 motion and pre-sentence Rule 33 motion can both claim ineffective assistance of counsel—and thus appear to be motions for "similar relief"—they are not motions for "similar relief" within the meaning of § 23–110(e); the first motion, asking for a new trial under Rule 33, is not a post-conviction collateral attack providing the required predicate for a § 23–110(e) "successive motion" bar.

By definition, appellant's letter/motion was not—indeed, it could not have been—filed under § 23–110, so the ruling on appeal here, the first under § 23–110, cannot be deemed "successive." Appellant, therefore, is entitled to the hearing that the law, drawn as it is, gives him. If someone wants to construe § 23–110(e) as allowing the trial court to bar a § 23–110 motion as a "second or successive motion for similar relief," even though the first motion was brought before sentence under Super.Ct.Crim.R. 33, rather than under D.C.Code § 23–110, then the statute should be amended.

I do not believe an appellate court should elect to bend or expand statutory language (here, "successive motion for similar relief") in a way that denies, rather than confirms, a prisoner's access to court to argue a violation of constitutional rights. That approach, advocated by the government, would result in a gratuitous—not a required—appellate court ruling manifestly intended to snuff out any

---

**3.** The situation would be different, of course, if appellant had filed his new trial motion after sentencing, *see (Jimmy) Johnson,* 385 A.2d at 743, or if appellant had filed his § 23–110 motion after the resolution of his direct appeal, in which case the court could have properly denied appellant's § 23–110 claim if it raised identical issues already resolved or new issues inexcusably omitted on direct appeal, *see Moore v. United States,* 608 A.2d 144, 146 (D.C.1992), *cert. de-*

nied, —— U.S. ——, 113 S.Ct. 1324, 122 L.Ed.2d 709 (1993); *Head v. United States,* 489 A.2d 450, 451 (D.C.1985). In this case, however, appellant filed his new trial motion before sentencing and filed his § 23–110 ineffective assistance claim during the pendency of the direct appeal, simultaneously applying for a stay of appellate proceedings in accord with our directive in *Shepard v. United States,* 533 A.2d 1278, 1280 (D.C.1987).

possible use of habeas corpus, after conviction, when the trial court has volunteered a hearing on a new trial motion filed before sentencing. I cannot accept that stingy approach, especially when Fourth and Sixth Amendment rights are implicated, as they are here.

If both motions at issue here had been brought under § 23–110 after sentencing, the case would be different. In that situation, it clearly would have been appropriate for the trial court to consider whether it should disregard the second motion as a "successive motion" under § 23–110(e).[4] In the actual case before us, however, the trial court effectively transmuted a pre-sentence new trial motion—a motion which the trial court gratuitously entertained—into a preclusive result that no statute or court rule authorizes. Appellant wrote a *pro se* letter, after the deadline for a new trial motion had expired, which the trial court agreed to entertain as a new trial motion filed out of time. The fact that the trial court volunteered to hear the matter should not become an excuse for announcing after the fact, and for the first time, that in legal effect that letter had become, not a new trial motion after all, but really a § 23–110 motion—indeed the *only* such motion appellant could file, even though he had not been sentenced when he filed it!

This is not to say that the trial court must hold redundant hearings when a defendant raises the very same matter in both a Rule 33 motion and a § 23–110 motion. D.C.Code § 23–110(c) provides that no hearing is required where "the motions and files and records of the case conclusively show that the prisoner is entitled to no relief." Where a § 23–110 motion raises exactly the same point that has already been resolved in a prior Rule 33 hearing, then the trial court has no obligation to reenact the same scenario. But that is not what happened here. In this case, the § 23–110 motion did repeat the claim of ineffective assistance of counsel already alleged in the new trial motion, including ineffectiveness in failing to file a motion to suppress tangible evidence. But the

§ 23–110 motion raised the suppression issue on an altogether different basis from the one previously argued. Appellant now claims, for the first time, that trial counsel should have filed a motion to suppress based upon a warrantless entry. Thus, a hearing on this issue, which was not addressed at the hearing on appellant's new trial motion, will not involve the trial court in pointless repetition.

---

4. It is important to remember, too, that § 23–110(e) does not necessarily *preclude* a second or successive § 23–110 motion. *See Vaughn v. United States,* 600 A.2d 96, 97 (D.C.1991) (noting that consideration of successive motion under § 23–110 may be required to achieve "ends of justice").